UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NICHOLAS HERNANDEZ,

                    Plaintiff,

          v.

THE CITY OF NEW YORK; JESSICA S.
TISCH, as Police Commissioner, Police
Department City of New York; EDWARD A.
CABAN, as Former Police Commissioner,
Police Department City of New York; and
AMY J. LITWIN, as Former Deputy
Commissioner Department Advocates Office,
Police Department City of New York; each
sued in their official and individual capacity as
an employee of Defendant THE CITY OF
NEW YORK,

                    Defendants.

25-CV-1867 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

This case arises in the aftermath of an internal investigation and disciplinary proceeding conducted by the New York City Police Department ("NYPD") into a domestic violence incident allegedly perpetrated by a former officer, Plaintiff Nicholas Hernandez, against his then-girlfriend. Believing he was wronged by the NYPD's dogged pursuit of him, and its follow-up investigation into a separate incident a year later, Hernandez brings this action against the City of New York ("the City"), along with Police Commissioner Jessica Tisch, Former Police Commissioner Edward Caban, and Former Deputy Commissioner Amy Litwin (collectively "Defendants"), in their official and individual capacities. In particular, he alleges that the NYPD treated him more harshly than similarly situated female and politically connected officers, which he claims culminated in his eventual resignation. He brings several constitutional claims under 42 U.S.C. § 1983, as well as claims of gender discrimination and retaliation under the New York State Executive Law ("NYSHRL") § 296 and the New York City Human Rights Law ("NYCHRL") § 8-107, and for discrimination based on his status as a victim of

domestic violence under § 8-107. Defendants now move to dismiss. They first argue that, to the extent Hernandez is challenging the decision to adopt the recommendation that he be found guilty of the charges in the first disciplinary proceeding, he should have raised these claims in an Article 78 proceeding, and is now time barred from doing so. They further contend that Hernandez has otherwise failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted in its entirety.

## BACKGROUND

The following facts are derived from Hernandez's Complaint, and are assumed to be true for purposes of this motion. *See Rodriguez v. Westchester Cnty.*, 2025 WL 1031371, at *1 (S.D.N.Y. Apr. 7, 2025).

Hernandez, a former NYPD officer, was arrested and charged following an October 27, 2022 incident in which his then-girlfriend, also a police officer, accused him of beating and strangling her in their bed after he claimed she had been unfaithful. *See* Dkt. No. 5 ("Compl.") ¶¶ 30–41. Shortly thereafter, the NYPD brought disciplinary charges against him, including two counts of prohibited conduct for "engaging in a physical altercation" and leaving the scene of an incident. *Id.* Throughout the proceedings that followed, which were led by NYPD Assistant Deputy Trial Commissioner Jeff Adler, Hernandez maintained his innocence and raised several defenses, including that he was engaging in self-defense as the victim of domestic violence himself. *Id.* at 2, ¶¶ 10–11. The NYPD called multiple witnesses including the police officers who responded to the scene and were assigned to the case, and introduced evidence including body-camera footage from responding police officers, a recording of his girlfriend's 911 call, her interview with officers later that day, and photographs of her injuries. *Id.* ¶¶ 12, 30, 36–37.

On November 15, 2023, Defendant Caban adopted a Report and Recommendation drafted by Adler, finding Hernandez guilty, and imposing a 30-day suspension without pay, a forfeiture of vacation days, mandatory counseling, and one-year of probation. *Id.* ¶ 110. Following a second

2

investigation by the NYPD in early 2025, in which Hernandez was accused of obscuring his license plates in violation of a New York State Vehicle and Traffic Law, he alleges that he was forced to retire, which he did on February 20, 2025. *Id.* ¶¶ 111–17.

Hernandez claims that the events that led to his resignation were fueled by a combination of the NYPD's reliance on arbitrary standards; gender discrimination against male officers accused of domestic violence, who he claims are treated more harshly than their female counterparts; and his lack of political connections, which he contends have insulated other officers charged with more egregious conduct. *Id.* at 2–3, ¶¶ 47, 60, 67, 71, 75–109, 118, 120, 123, 129, 137. If the disciplinary standards were applied uniformly, Hernandez maintains that "literally hundreds of NYPD personnel" would be subject to disciplinary proceedings, *id.* ¶ 72, but are not due to rampant political affiliation and gender-based discrimination.

Hernandez brings seven claims against Defendants for: (1) "political affiliation discrimination" under 42 U.S.C. § 1983; (2) equal protection violations under 42 U.S.C. § 1983; (3) gender discrimination under NYSHRL § 296; (4) retaliation under NYSHRL § 296; (5) gender discrimination under NYCHRL § 8-107; (6) violations of the domestic violence protections under NYCHRL § 8-107.7; and (7) retaliation under NYCHRL § 8-107. Defendants now move to dismiss, arguing that Hernandez's grievances should properly have been brought in a state court proceeding pursuant to Article 78 of New York's Civil Practice Law and Rules, where they would have been barred by a four-month statute of limitations. *See* N.Y. C.P.L.R. §§ 217(1), 7801. Defendants thus ask the Court to convert Hernandez's action into an Article 78 proceeding and dismiss it as untimely. They further argue that the Court should dismiss his Complaint for failure to state a plausible claim under federal, state, or local law pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 18 ("Defs. Br.") at 2. For the reasons that follow, the Court grants Defendants' motion to dismiss for failure to state a claim.

**LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1] However, in "considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint . . . [and] draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011). In answering this question, the Court must "accept as true all factual allegations . . . but [is] not required to credit conclusory allegations or legal conclusions couched as factual . . . allegations." *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020).

**DISCUSSION**

**I.      Article 78**

As an initial matter, Defendants assert that to the extent Hernandez challenges the outcome of the NYPD's decision, his claim should have been brought in state court as a New York State Article 78 proceeding and that this Court should now convert his action into an Article 78 proceeding and dismiss it as untimely. *See* Defs. Br. at 13. Hernandez disputes their characterization of his claim, and maintains that "he does not seek judicial review of an administrative determination under Article 78," but "[r]ather [brings] . . . independent claims for violations of his constitutional rights and statutory

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

protections . . . ." Dkt. No. 19 ("Pl. Opp'n") at 12. Proceedings under Article 78 "are typically the avenue for parties challenging administrative actions by governmental agencies or by the decisionmaking bodies of private entities," and district courts can convert claims to Article 78 proceedings where appropriate. *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 205 (S.D.N.Y. Sept. 28, 1998) (citing *Clarke v. Trs. of Columbia Univ.*, 1996 WL 609271, at *2 (S.D.N.Y. Oct. 23, 1996)). Here, however, Hernandez "seeks neither to compel nor to prohibit any action by [D]efendants." *Id.*; *see* Compl. ¶¶ 41–148. Rather than take issue with the ultimate conclusions of the disciplinary proceeding, he challenges the process, which he maintains is replete with systemic biases along the axes of gender and political allegiance. As such, this action is properly before the Court, will not be converted to an Article 78 proceeding, and is not time-barred.

## II.    Federal Claims

Hernandez brings two federal claims against Defendants under 42 U.S.C. § 1983 for (1) violations of the First Amendment,[2] and (2) violations of the Equal Protection Clause under a theory of selective enforcement. *See* Compl. ¶¶ 121–28. The Court grants Defendants' motion to dismiss with respect to all federal claims.

### A.  First Amendment Claim

The main thrust of Hernandez's First Amendment violation claim is that he was subjected to disciplinary proceedings for both the domestic violence allegation and traffic infraction, and suffered adverse employment consequences in the form of his forced retirement, due to his "lack of political affiliations or connections with influential figures within the NYPD and local political networks." *Id.* ¶ 121. He claims that Defendants relied on "political favoritism" to select which officers they investigated more vigorously, and that he, devoid of any such connections, received the proverbial short end of the stick. *Id.* ¶ 122.

---

[2] "The Supreme Court has held that the Fourteenth Amendment incorporates the protections of the First Amendment against state governments." *Slattery v. Hochul*, 61 F.4th 278, 287 n.1 (2d Cir. 2023) (collecting cases).

### 1. Political Affiliation Discrimination

Hernandez appears to style his primary allegations as a "First Amendment political affiliation claim based on disparate treatment and lack of patronage protection." Pl. Opp'n at 15. Defendants counter that "no such claim under the First Amendment exists," Defs. Br. at 14, and instead analyze his claim as one sounding in First Amendment retaliation. The Supreme Court and the Second Circuit have long recognized a line of freedom of association cases regarding an employee's political affiliation. The seminal case, *Rutan v. Republican Party of Illinois*, held that "conditioning public employment on the provision of support for the favored political party unquestionably inhibits protected belief and association." 497 U.S. 62, 69 (1990). Rather than just protecting members of the opposing political faction, the First Amendment extends to protect "politically neutral employees who are treated less favorably than employees politically aligned with those in power." *Id.* at 28 (collecting cases); *see also Wrobel v. Cnty. of Erie*, 692 F.3d 22, 27–28 (2d Cir. 2012) ("The First Amendment right extends to associational conduct, including the decision not to support or affiliate with a political party or faction.").

To succeed on such a claim brought pursuant to Section 1983, a plaintiff must demonstrate that "(1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." *Wrobel*, 692 F.3d at 27. Hernandez, however, has failed to plausibly allege that he engaged in constitutionally protected conduct. Although "[n]on-affiliation is protected by the First Amendment," Hernandez's allegation that he was discriminated against due to his "lack of political affiliations or connections with influential figures within the NYPD and local political networks," Compl. ¶ 121, does not. Failing to associate with perceived powerbrokers at a city agency is not the type of affiliation granted protection under the First Amendment.

Hernandez does not suggest that he was discriminated or retaliated against on the basis of his decision not to affiliate with a particular political party. Instead, he relies on his lack of connections with powerful officials within the NYPD. "Such a scenario does not fall within the ambit of political affiliation claims." *Wetzel v. Town of Orangetown*, 2015 WL 745703, at *9 (S.D.N.Y. Feb. 9, 2015). Although the Supreme Court and Second Circuit have not limited constitutionally protected affiliation "only to the extent it can be characterized as political," there are still limits on the type of affiliation that is protected. *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133 (2d Cir. 2013). In evaluating whether an affiliation or non-affiliation may be protected, courts look to whether the "beliefs sought to be advanced by association . . . pertain to political, economic, religious or cultural matters," *id.* (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958)), which constitute the core of those activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347 (1976). At bottom, the constitutional protection of political, economic, and other types of affiliation is motivated by the concern that, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Elrod*, 427 U.S. at 356.

The Second Circuit has held that labor unions fall under the First Amendment's protection since they "advocate [for] the economic interest of their members," in addition to their typical participation in partisan politics, and due to the "well-established principle that union activity is protected by the First Amendment." *Rowland*, 718 F.3d at 133–34. By contrast, in *Wetzel v. Town of Orangetown*, the court held that the plaintiff's reliance on her "non-membership in an Irish-American social group," was not the type of political non-affiliation contemplated by the First Amendment. 2015 WL 745703, at *9. Similarly here, Hernandez's lack of connections to high-ranking NYPD officials is not the type of non-association at "the core of those activities protected by the First Amendment." *Elrod*, 427 U.S. at 356. Even if his lack of connections conferred the First Amendment's protections on him, Hernandez does not allege that Defendants were aware of any such lack of connections. *See*

7

*O'Neill v. Edelman*, 2009 WL 10740076, at \*5 (S.D.N.Y. Mar. 5, 2009) (dismissing political affiliation claim where the plaintiff failed to allege that the defendants were aware of his political affiliation). As a result, he does not plausibly allege a First Amendment political affiliation claim.

### 2.  First Amendment Retaliation

To the extent Hernandez's claim can be construed as a First Amendment retaliation claim, it too fails. To state a First Amendment retaliation claim, "a plaintiff must establish that (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011). Hernandez's claim fails at the first prong. To engage in protected First Amendment speech, "an employee must speak as a citizen on a matter of public concern." *Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 289 (S.D.N.Y. 2019) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 417–18 (2006)). Courts have typically found those matters of public concern to include "any matter of political, social, or other concern to the community," not speech that is "personal in nature and generally related to the speaker's own situation." *Raymond v. City of New York*, 317 F. Supp. 3d 746, 773 (S.D.N.Y. 2018). But Hernandez does not allege *any* speech or conduct that he engaged in, let alone the kind that would rise to the level protected by the First Amendment. Although he repeatedly asserts that he was targeted for his lack of political connections within the NYPD, at no point does he assert that he said as much during (or outside of) any of the disciplinary proceedings or that he otherwise made his views known to the NYPD such that he might have then been subjected to retaliatory treatment.

Accordingly, Hernandez's First Amendment claims are dismissed.

### B.  Equal Protection Violations

Hernandez further alleges that Defendants have violated his right to equal protection of the law under the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 1. "There are three types of equal protection claims that can be asserted: (1) selective enforcement; (2) discriminatory intent; and (3)

class of one." *Shtilman v. Makram*, 2018 WL 3745670, at *7 (S.D.N.Y. Aug. 6, 2018). Hernandez appears to allege two selective enforcement claims, asserting that Defendants engaged in (1) selective enforcement of "disciplinary measures based on political favoritism, treating officers with political affiliations or connections to influential figures within the NYPD more favorably than Plaintiff," Compl. ¶ 125, (2) as well as on the basis of gender. To prevail on either claim, "a plaintiff must prove that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations," *Thomas v. Genova*, 2025 WL 583182, at *3 (2d Cir. Feb. 24, 2025), "such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person," *Bar-Levy v. Gerow*, 2020 WL 814925, at *5 (S.D.N.Y. Feb. 19, 2020) (citing *Tyk v. Surat*, 675 F. App'x 40, 42 (2d Cir. 2017)). Something more than a "bare allegation that other" people "were treated differently is required." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 604 (S.D.N.Y. 2010). At the motion to dismiss stage, a complaint "need not contain detailed factual allegations" but must "plead factual allegations that raise a right to relief that is plausible on its face." *Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019). The Court must assess whether "it is plausible that a reasonable jury could ultimately conclude that plaintiff is similarly situated to an alleged comparator." *Id.*; *see also Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 8 (S.D.N.Y. 2017). These claims also fail.

### 1. Selective Enforcement – Political Affiliation

In his first selective enforcement claim, Hernandez alleges that fellow officers regularly escaped punishment as harsh as his for similar violations of the NYPD's disciplinary code, due to their political connections with Defendant Caban and other NYPD officials. The second prong of a selective enforcement claim asks whether the differential treatment was motivated by an intention to discriminate on the basis of impermissible considerations. For the purposes of his political affiliation selective enforcement claim, Hernandez does not attribute any of his alleged treatment to his

membership in a protected class, or to punish or inhibit the exercise of his constitutional rights. The only viable basis for such a claim would thus be Defendants' "malicious or bad faith intent to injure" him. *Zahra v. Town of Southold*, 48 F.3d 674, 683–84 (2d Cir. 1995). The Court assumes he does so, given his assertion that "Defendants['] . . . actions were motivated by Plaintiff's lack of connections or loyalty to influential figures within the NYPD." Compl. ¶ 123. Even assuming as much, however, he fails to plausibly allege that he was treated differently from similarly situated comparators.

Although he points to several potential comparators, none are sufficiently developed for a selective enforcement claim, even at the motion to dismiss stage. Courts in this district are divided on whether the standard for the similarly situated test is the same for selective enforcement claims and class of one claims, with some stating that the test is the same for both, which requires "plaintiffs asserting a selective enforcement claim to show an extremely high degree of similarity between themselves and the claimed comparators." *Mosdos Chofetz Chaim, Inc.*, 815 F. Supp. 2d at 694. Others "have applied a slightly less stringent similarly situated standard in the selective enforcement context," *id.* at 695, pursuant to which "plaintiffs must identify comparators whom a prudent person would think were roughly equivalent[, but] . . . need not show an exact correlation between [themselves] and the comparators." *Id.* at 696. Stated differently:

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as the lawyer's art of distinguishing cases, the 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

*Id.* (citing *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 463 (E.D.N.Y.)). Hernandez's comparators are lacking under either standard.

He first points to Officer Willie L. Thompson, who was accused of "sleeping with a woman who saw two men carjack a motorist in Washington Heights on May 23, 2021." Compl. ¶¶ 75–76. The same city official who drafted Hernandez's Report and Recommendation, Assistant Deputy Trial

Commissioner Jeff Adler, purportedly recommended Thompson's termination. *Id.* ¶¶ 77–78. But instead of adopting Adler's recommendations, Hernandez alleges that Caban "swooped in and saved his career," *id.* ¶ 75, by "instead impos[ing] an 'unreviewable' penalty: thirty [30]-day loss of vacation days and one [1] year dismissal probation." *Id.* ¶ 80. He insists that this mitigated penalty stemmed from Thompson's "political affiliation." *Id.* ¶ 81. The second comparator is Officer Kimberly Lucas, who pled guilty to possessing and submitting fraudulent COVID-19 vaccine cards, resulting in a recommendation that she be terminated. *Id.* ¶¶ 82–83. Instead of termination, Officer Lucas received a reduction of 85 days to her vacation bank and "one [1] year dismissal probation." *Id.* ¶¶ 84–88. Hernandez alleges that when rejecting the recommended penalty of termination, Defendant Caban stated that he disagreed that termination was appropriate, *id.*, citing several mitigating factors, including Lucas's "nine years of exemplary service . . . with favorable performance evaluations and no formal disciplinary history," along with "several medals for meritorious police duty and excellent police duty." *Id.* ¶¶ 90–91. Hernandez points to three additional comparators—Handoly Ramos, Kaz Daughtry, and Delare Rathour—who also received, in his estimation, more generous reductions in penalties for similar violations. *Id.* ¶¶ 96–109.

None of these comparators are sufficiently similar for the purposes of a selective enforcement equal protection claim. First, four of the five officers did not face disciplinary charges for committing acts of domestic violence. *Id.* ¶ 75–96. Moreover, unlike Hernandez, two of the comparators cited, Ramos and Daughtry, accepted responsibility and pled guilty to their disciplinary charges. *Id.* ¶ 96. Although Rathour, like Hernandez, faced charges resulting from an alleged incident of domestic violence, unlike Hernandez, the initial recommendation following his disciplinary hearing was termination. *Id.* ¶ 97. Hernandez fails to provide information concerning Caban's alleged deviation from the recommendation in Rathour's case necessary to assess whether he ultimately received more favorable treatment than Hernandez.

Importantly, in several of the instances cited—Thompson, Lucas, and Rathour—the officers faced an initial recommendation of termination, far graver than Adler's recommendation for Hernandez, which instead consisted of a 30-day suspension, missed vacation days, one year of probation, and counseling. Rather than focusing on whether there was in fact differential treatment, he appears instead to fixate on instances where Caban deviated from the recommendations of the Assistant Deputy Trial Commissioner, which he did not do with respect to Hernandez. Notably, though, those reduced penalties were often more in line with what Hernandez himself received—with Thompson and Lucas, for example, receiving 30 and 85 days of lost vacation respectively, along with one year dismissal probation. *See id.* ¶ 80. Finally, Hernandez does not allege that any of the five comparators were accused of additional acts of misconduct following the resolution of their disciplinary charges, unlike Hernandez, who was subsequently investigated for a separate charge. *Id.* ¶¶ 110–20.

### 2. Selective Enforcement – Gender-Based Discrimination

Hernandez next asserts that Defendants entertained a "systemic presumption that male officers accused of domestic violence are the aggressors while female officers are shielded from accountability." Pl. Opp'n at 20–21. As a result, he maintains that he was treated more harshly than similarly situated female officers "charged with domestic violence, dishonesty, or alcohol-related misconduct [who] were permitted to remain on the force or receive mitigated penalties." *Id.* at 21. He adds that the disciplinary tribunal relied on gender stereotypes, pointing to "the tribunal's refusal to seriously consider [his] claims of being domestic violence victim, even when presented with credible supporting evidence." Compl. at 3. This claim, too, must be dismissed.

Although Hernandez alleges that the selective treatment he received was motivated by an intention to discriminate on the basis of gender, he fails to "plead facts supporting his otherwise speculative assertions." *See Liang v. City of New York*, 2013 WL 5366394, at *10 (E.D.N.Y. Sept. 24, 2013). "Any claims of improper targeting . . . require pleading of facts to support it." *Id.* Rather, Hernandez conclusorily states that he received disparate treatment as compared to similarly situated

female officers, but none of his comparators support this assertion. *See e.g.*, *Pantoja v. Enciso*, 2019 WL 6704684, at *8 (S.D.N.Y. Dec. 10, 2019), *R. & R. adopted*, 2020 WL 70919 (S.D.N.Y. Jan. 6, 2020) (dismissing a plaintiff's selective enforcement claim on the basis of gender for failure to explain how she was similarly situated to her comparators). Indeed, he appears to identify only one female officer—Officer Lucas—who was not charged with a similar crime and who like Hernandez, received a year of probation among other penalties. *See* Compl. ¶¶ 89, 95. He does not allege with any particularity or factual support that female officers facing similar charges walked away with lesser penalties, and "[w]ithout even a whiff of facts other than the gender difference [between plaintiff and comparator], all that is offered are naked assertions of discrimination." *Liang*, 2013 WL 5366394, at *11. Hernandez's mere assertions that gender played a role in any differential treatment are conclusory at best and cannot survive a Rule 12(b)(6) motion.

### III.    Claims Against the City of New York

The Court now briefly turns to whether Hernandez has alleged a *Monell* claim, which is the only mechanism to bring a Section 1983 claim against the City. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–92 (1978). Hernandez asserts section 1983 claims against the City for the alleged misconduct of NYPD personnel. To establish the City's liability on these claims, he must "show that it bore some responsibility for violations of his constitutional rights." *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 320 (S.D.N.Y. Nov. 23, 2009). To do so, Hernandez would have needed to allege "both a constitutional violation and a sufficient causal relationship between the violation and a municipal policy or practice." *Id.* Since the Court concludes that he has not plausibly alleged any constitutional violations, to the extent Hernandez was alleging a *Monell* claim against the City, it necessarily fails. The Court need not address the remainder of the *Monell* test.

### IV.    State and Local Law Claims

In addition to his Section 1983 claims, Hernandez asserts several claims under the NYSHRL and NYCHRL for gender discrimination and retaliation, as well as a claim that he is a victim of

13

domestic violence as defined by NYCHRL § 8-107. Compl. ¶¶ 139–148. When all federal claims are dismissed, district courts typically "decline to exercise supplemental jurisdiction over pendent state law claims." *Fisk v. Letterman*, 501 F. Supp. 2d 505, 528 (S.D.N.Y. 2007) (collecting cases). Accordingly, having dismissed all of the claims over which this Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over any of Hernandez's state or local law claims. The Court therefore dismisses his state and local law claims against all Defendants. *See Lawtone-Bowles v. City of New York,* 22 F. Supp. 3d 341, 353 (S.D.N.Y. 2014).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted in its entirety. Hernandez shall have thirty (30) days to amend the Complaint to the extent he has a good faith basis to do so. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. No. 17.

SO ORDERED.

Dated:     March 18, 2026
           New York, New York

_____
Ronnie Abrams
United States District Judge